## RAINIER BREWING COMPANY, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4895. Promulgated June 18, 1946.

*A. Calder Mackay, Esq., Adam Y. Bennion, Esq., F. Sanford Smith, Esq.,* and *Scott H. Dunham, C. P. A.,* for the petitioner.
*B. H. Neblett, Esq.,* for the respondent.

**OPINION.**

HARRON, *Judge*: *Issue 1.*—The first issue raised by the pleadings is whether $1,000,000 in notes received by petitioner in 1940, in consideration of the exclusive and perpetual right to use the trade names "Rainier" and "Tacoma" in the manufacture and sale of alcoholic malt beverages in the State of Washington and the Territory of Alaska, was ordinary income and taxable as such. The question turns on whether the sum of $1,000,000 is to be regarded as prepaid royalties, or whether it is to be regarded as an expenditure in the acquisition of a capital asset.

The decision of this issue is governed by the decision in *Seattle Brewing & Malting Co.*, 6 T. C. 856. In that case the issue was whether the taxpayer (the purchaser) was entitled to deduct from its income any portion of the $1,000,000 which on July 1, 1940, it agreed to pay to Rainier upon the exercise of the option of electing to terminate all royalties payable under the contract of April 23, 1935, under a theory that the $1,000,000 constituted a payment of royalties. The contract there under consideration was the same contract which we have before us here, and the decision of the question depended upon whether the $1,000,000 was paid in the acquisition of a capital asset or whether it was royalties paid under a licensing agreement. The evidence in the instant case is not materially different from the evidence presented in the *Seattle* case. In that case we said:

> * * * We find no ambiguity in the contract and the language in paragraph thirteenth is clear. It provides that at any time after five years petitioner "shall have the right and option of electing to terminate all royalties thereafter payable hereunder" by executing and delivering to Rainier its promissory notes in the principal sum of $1,000,000. Obviously, it was intended that after the execution of the notes all royalty payments as such should cease. The agreement admits of no other construction. Thereafter Rainier must look for payment to the promissory notes and not to the contract. The execution and delivery of the notes put an end to the payment of royalties on a barrelage basis and was the consideration for the exclusive and perpetual use of such rights thereafter. It is our opinion that upon the exercise of the option petitioner acquired a capital asset for which it paid $1,000,000. * * *

Upon the authority of *Seattle Brewing & Malting Co., supra*, we hold that the transaction here in question was a capital transaction and the sum received by petitioner for the exclusive and perpetual right to use the trade names in the manufacture and sale of alcoholic malt beverages within the limited territory was not ordinary income within the purview of section 22 of the Internal Revenue Code.

*Issue 2.*—Since the sum which petitioner received from Century on July 1, 1940, did not constitute ordinary income, but represented a payment for a capital asset, a question arises whether or not petitioner realized any gain from the transaction as it was carried out by Century. It is the contention of the petitioner that the entire face amount of the notes received in 1940 upon the exercise of the option constitutes proceeds from a sale, and that it is entitled to use as its basis, for the computation of gain or loss on the transaction, the March 1, 1913, value of the trade names, and that such value was in excess of the $1,000,000 received. Petitioner concedes, however, that in computing the adjusted basis for such property there should be deducted the sum of $138,137.40, which is that portion of the total amount of $406,680.20 "allowed" by respondent as a deduction for obsolescence of

good will to petitioner's predecessor in the years 1918 to 1920, inclusive, which represented a tax benefit to petitioner's predecessor.

The respondent, on the other hand, contends that petitioner is not entitled to use the March 1, 1913, value, if any, as the basis for the trade names and good will, since such property was wholly destroyed by the advent of national prohibition in 1920, and, since petitioner has not shown any cost allocable to trade names incurred since that date, the new basis for the revived trade names must be considered to be zero. He further challenges the value of the trade names contended for by the petitioner and, in the alternative, contends that the agreement not to compete can not be regarded as part of the trade names or good will transferred; that at least one-half of the $1,000,000 in option notes constituted compensation to petitioner for its agreement not to compete in the beer business in the Washington area, and was, therefore, ordinary income to petitioner; and that, accordingly, the amount received as proceeds from the sale can not be in excess of $500,000. He further contends, in the alternative, that there must be deducted from the March 1, 1913, value, in order to find an adjusted basis, the entire sum of $406,680.20 which was "allowed" as obsolescence of petitioner's predecessor for the years 1918 to 1920, inclusive.

The respondent's contention that petitioner is not entitled to use the March 1, 1913, value, if any, as the basis for the trade names and good will disposed of in 1940, because such property was wholly destroyed by the advent of national prohibition, does not find support in the record. There is no evidence whatever in the record that the trade name "Rainier" became worthless as a result of prohibition. Indeed the record conclusively establishes the contrary. The trade name was never abandoned during prohibition, but was used in the sale of near beer and soft drinks under such labels as "Rainier," "Rainier Lager," "Rainier Old German Lager," and "Rainier Malt Tonic" throughout the period of state prohibition in Washington and national prohibition thereafter. Moreover, the registration of its trade names in the United States Patent Office and in the State of Washington was kept alive from 1898 down to the present time, having been renewed from time to time during this period. Upon the repeal of prohibition after 1932 "Rainier" beer was again put on the market by petitioner. Although it is obvious that the value attaching to the trade name "Rainier" and the good will of petitioner's predecessor corporations fluctuated very materially during the period from 1915 to 1933, it nevertheless does not follow that Rainier lost the use of its 1913 basis. The good will survived and it is immaterial that its value revived after prohibition. It has never been supposed that the fluctuation of value of property would destroy the taxpayer's basis. In fact, if a deduction has been taken for worthlessness, such deduction will

deprive a taxpayer of its basis only to the extent that it results in a tax benefit. Cf. *Estate of James N. Collins*, 46 B. T. A. 765; affd., 320 U. S. 489, and *John V. Dobson*, 46 B. T. A. 770; affd., 320 U. S. 489. We are of the opinion that the petitioner's basis for determining gain or loss upon the sale of its trade names and good will in 1940 is the fair market value of such property as of March 1, 1913, adjusted under section 113 (b) (1) (B) of the Internal Revenue Code.

In the instant case it is apparent that the good will value to be applied against the amount received for the trade names in 1940 is the value of the trade names as of March 1, 1913, so the value to be placed thereon is what a willing buyer, with a full knowledge of the facts, would pay and a willing seller, not acting under any compulsion to sell, would accept for such property. In the computations by the petitioner's expert witnesses there has been no allowance for the value of good will, as such, separate and apart from the trade names used in the business. The petitioner insists that the good will, as mathematically computed under an approved formula, represents the value of the trade names. Good will is an intangible, and just what goes into the caldron to make up the sum of its ingredients is sometimes difficult to determine, but it would seem clear that the value of the trade names was not the full content of good will value attached to the business of petitioner's predecessors as of March 1, 1913. In determining the value of the trade names, we have taken into consideration all of the evidence in the record, including the stipulations of the parties, the opinions of the expert witnesses, and the methods used by them in arriving at their estimated values of the good will as of March 1, 1913. We have also considered the fact that the total value of good will included other elements besides the value of the trade names, and that there was a pronounced trend toward prohibition in the State of Washington, where 82 per cent of the income from sales of petitioner's products was realized. Moreover, we have assumed a buyer conversant with all these facts. In our judgment the value of the trade names here in question as of March 1, 1913, was $514,142, and we have so found as a fact.

In *C. C. Wyman & Co.*, 8 B. T. A. 408, we said that good will is not necessarily confined to a name. It may as well attach to a particular location where the business is transacted, or to a list of customers, or to other elements of value in the business as a going concern. In *Ithaca Trust Co. v. United States*, 279 U. S. 151, Justice Holmes said that the value of the thing to be taxed must be estimated as of the time when the act is done, "but the value of property at a given time depends upon the relative intensity of the social desire for it at that time, expressed in the money that it would bring in the market." Obviously "relative intensity of the social desire" for the trade names "Rainier"

and "Tacoma" at March 1, 1913, would have been tempered by all of the hazards incident to the business and the future prospects of gain then apparent from the use of such trade names.

*Issue 3.*—The above holding brings us to the third question, relating to the adjusted basis to be used for determining gain or loss from the transaction in 1940 wherein the petitioner granted and the purchaser, Century, acquired an exclusive and perpetual right to use the trade names "Rainier" and "Tacoma" in the manufacture and sale, of alcoholic malt beverages in the State of Washington and the Territory of Alaska for $1,000,000. The applicable provision of the statute is set out in the margin.[1]

It appears from the record that petitioner's predecessors filed income tax returns for the years 1918, 1919, and 1920, but claimed no deduction therein for obsolescence of good will or trade names. In July 1920 Seattle, a predecessor, filed a claim for abatement of taxes for the year 1919 based on a claim for obsolescence of good will due to prohibition legislation. The Commissioner computed the good will value as of March 1, 1913, to be $406,680.20. Of this amount $345,061.95 was allocated to the year 1918, $59,153.48 to the year 1919, and $2,464.77 to the year 1920. It is stipulated that petitioner's predecessors derived tax benefits from such allocation in the amounts of $78,983.92 for the year 1918 and $59,153.48 for the year 1919, making a total of $138,137.40. The respondent now argues that $406,680.20 was "allowed" for obsolescence of good will and that this amount must be deducted from the March 1, 1913, value as determined here in computing the adjusted basis under section 113 (b) (1) (B) of the Internal Revenue Code. The respondent relies on *Virginian Hotel Corporation of Lynchburg* v. *Helvering*, 319 U. S. 523; rehearing denied, 320 U. S. 810, and *Commissioner* v. *Kennedy Laundry Co.*, 133 Fed. (2d) 660; certiorari denied, 319 U. S. 770; rehearing denied, 320 U. S. 810. It is the petitioner's position that because no claim was made by its

---

[1] SEC. 113 [I. R. C.] ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property ; except that—

\* \* \* \* \* \* \*

(14) PROPERTY ACQUIRED BEFORE MARCH 1, 1913.—In the case of property acquired before March 1, 1913, if the basis otherwise determined under this subsection, adjusted (for the period prior to March 1, 1913) as provided in subsection (b), is less than the fair market value of the property as of March 1, 1913, then the basis for determining gain shall be such fair market value. \* \* \*

(b) ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

(1) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—

\* \* \* \* \* \* \*

(B) In respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence \* \* \* to the extent allowed (but not less than the amount allowable) under this chapter or prior income tax laws. \* \* \*

predecessors for obsolescence for the years 1918 and 1920 the amount allocated to those years by the Commissioner, as to which no tax benefit was realized, has not been "allowed" within the meaning of section 113 (b) (1) (B) or within the decision of the Supreme Court in the *Virginian Hotel* case. It argues that no amount was "allowable" for obsolescence of good will due to prohibition within the decision of the Supreme Court in *Clarke* v. *Haberle Crystal Springs Brewing Co.*, 280 U. S. 384, and, therefore, the amount of obsolescence "allowed" must be limited to the amount as to which a tax benefit was realized.

The *Virginian Hotel* case, *supra*, dealt solely with tangible assets. It is apparent from a perusal of the decision and the dissents thereto that the purpose of the statute was to limit depreciation to the taxable year in which it occurred and not permit the taxpayer to accumulate and apply it in a subsequent year when it would better suit his purpose. The Court pointed out that the provision in the statute makes it plain that the depreciation basis is reduced by the amount allowable each year, whether or not claimed, and that the basis must be reduced by that amount even though no tax benefit results from the use of depreciation as a deduction. "Wear and tear do not wait on net income." This situation can only arise in cases dealing with depreciable property. In the opinion the Court said:

\* \* \* "Allowed" connotes a grant. Under our federal tax system there is no machinery for formal allowances of deductions from gross income. Deductions stand if the Commissioner takes no steps to challenge them. Income tax returns entail numerous deductions. If the deductions are not challenged, they certainly are "allowed" since tax liability is then determined on the basis of the returns. Apart from contested cases, that is indeed the only way in which deductions are "allowed".

Annual depreciation in the case of good will is not permissible, because from the very nature of the asset it is not depreciable. Annual depreciation can only arise in cases dealing with depreciable property. Where, as in the case here, we have nondepreciable property the same situation does not obtain. A trade name is built up over the years and in the normal course of events is appreciated rather than depreciated, so that there is no amount allowable for exhaustion during a taxable year unless during that year there is a destruction of such intangible property. The *Virginian Hotel* case, *supra*, is, therefore, not controlling here. It is distinguishable on its facts and the rationale of that decision is not applicable here. The same may be said of *Commissioner* v. *Kennedy Laundry Co.*, *supra*, also relied upon by the respondent.

A more serious objection to the respondent's claim, however, is the fact that the Supreme Court in *Clarke* v. *Haberle Crystal Springs Brewing Co.*, *supra*, held that exhaustion or obsolescence of good will due to the prohibition amendment was not within the intendment of

the statute. In the opinion Mr. Justice Holmes, speaking for the Court, said:

* * * It seems to us plain without help from *Mugler* v. *Kansas*, 123 U. S. 623, that when a business is extinguished as noxious under the Constitution the owners cannot demand compensation from the Government, or a partial compensation in the form of an abatement of taxes otherwise due. It seems to us no less plain that Congress cannot be taken to have intended such a partial compensation to be provided for by the words "exhaustion" or "obsolescence." Neither word is apt to describe termination by law as an evil of a business otherwise flourishing, and neither becomes more applicable because the death is lingering rather than instantaneous.

It is well settled that, when the Supreme Court declares an act of the legislature to be unconstitutional, such an act never was law and was never binding as law. By the same token, where the Supreme Court has declared that the words "exhaustion" and "obsolescence" as used in the revenue laws do not include a loss of good will due to the prohibition amendment, the interpretation of the revenue laws must be to the effect that such a deduction was never granted by Congress. Since such deduction was never allowable under the revenue laws, it is difficult to see how the Commissioner by "allowing" a deduction which was never claimed can bind the taxpayer by such deduction as "allowed" within the meaning of the revenue act. In other words, a deduction "allowed," but not claimed or actually taken, can hardly be said to be "allowed" where there was no basis in the statute for such an allowance. Certainly, exhaustion and obsolescence can not be said to be allowed in the sense that those terms are used and understood by the Supreme Court in the *Virginian Hotel* case, *supra*, when applied to nondepreciable intangible assets. See also *Renziehausen* v. *Lucas*, 280 U. S. 387. We hold, therefore, that, for the purpose of computing the adjusted basis, the fair market value of the trade names as of March 1, 1913, can only be reduced by such amount as petitioner's predecessors received tax benefits therefrom, the amount of $138,137.40.

*Issue 4.*—The fourth and last question is whether any part of the $1,000,000 received by petitioner in 1940 should be allocated to petitioner's agreement not to compete which is set out in paragraph ninth of the contract of April 23, 1935. The petitioner contends that such agreement was incidental to the grant by it of an exclusive and perpetual right to use the trade names, and that the agreement had no value separate and apart from the trade names or good will. The respondent contends that at least $500,000 of the $1,000,000 paid on the exercise of the option agreement must be considered as an amount paid for the agreement not to compete.

In determining the deficiency, the respondent treated the $1,000,000 which petitioner received in 1940 as ordinary income under the royalty

contract, and neither in the deficiency notice [2] nor in the pleadings [3] is any value assigned by the respondent to the agreement not to compete, and no mention is made of it. Without any question, it is well settled that any amount received for an agreement not to compete would be taxable as ordinary income. *Estate of Mildred K. Hyde*, 42 B. T. A. 738; *John D. Beals*, 31 B. T. A. 966; affd., 82 Fed. (2d) 268; *Christensen Machine Co.*, 18 B. T. A. 256; *Christensen Machine Co.* v. *United States* (Ct. Cls.), 50 Fed. (2d) 282. There is, however, no direct evidence in the record as to the value of the agreement not to compete, nor does it appear that Century would not have purchased the exclusive right to the trade names without the agreement not to compete. Certainly there is nothing in the record to indicate that such agreement not to compete was worth $500,000.

It is obvious that in 1935, when the contract between petitioner and Century was entered into, an agreement not to compete had a substantial value, and it can not be said that paragraph ninth of the contract was mere words. It was perfectly possible for petitioner to sell the exclusive and perpetual right to use its trade names in the limited territory without any agreement not to compete, and it is conceivable that in that situation it might have continued selling beer in the territory under another trade name. Undoubtedly such competition, backed by petitioner's advertising and sales organization and by the good will attached to its corporate name, would have had some effect upon the sale of beer by Century under the trade name "Rainier." Moreover, there was obviously a nuisance value attaching to the right to compete which the purchaser of the trade name would want to eliminate, but any competition would be seriously narrowed by the equity rule, which was followed in the State of Washington, that the sale of the good will of a business carries with it an implied covenant by the seller that he

[2] "(a) In the taxable year you received a payment of $1,000,000.00 from the Century Brewing Association under a contract executed in 1935 whereby you granted to Century Brewing Company a license to use trade names, held by you, in connection with the marketing of beer, ale, and other alcoholic liquors made from malt, in the State of Washington and the Territory of Alaska. No income from such payment was reported in your return for 1940. You contend that the receipt of $1,000,000.00 represented the proceeds of a sale by you of good will and an interest in the trade names; that such good will and trade names have a basis, represented by the market value at March 1, 1913, in excess of the proceeds; that hence no deductible loss was allowable and no taxable gain was reportable. It is held that the contract executed in 1935 did not effect a sale of trade names or good will; that the payment of $1,000,000.00 received by you in 1940 was ordinary income taxable in full without any offset for the claimed basis.

It is further held that since the transaction did not constitute a sale, the income realized in 1940 may not be excluded from excess profits net income under section 721 of the Internal Revenue Code."

[3] Paragraph 5 (k) of the petition alleges:
"During the year 1940 Century exercised the option granted to it by said contract and delivered to petitioner promissory notes in the principal amount of $1,000,000.00, as a lump sum payment for the exclusive and perpetual right and license thereafter to manufacture and market beer, ale and other alcoholic malt beverages within the State of Washington and the Territory of Alaska under the trade names and brands of 'Rainier' and 'Tacoma'." This allegation was admitted by the respondent in his answer.

will not solicit the custom for which the purchaser paid, and with which he parted, for the consideration received. So, while the petitioner, in the absence of an agreement not to compete, might have been at liberty to engage in a similar business in the same locality in his own name, it is very doubtful whether he could have sold the same beer under another name and advertised the fact without being enjoined by the purchaser of his trade names. In *Cooper & Co.* v. *Anchor Securities Co.* (Supreme Court of Washington, 1941), 113 Pac. (2d) 845, suit was brought to restrain Anchor Securities Co. and its officers from directly soliciting insurance business from defendant's former customers after a sale of the business and good will to the plaintiff. In its opinion, holding that an injunction should issue, the court said:

In the absence of express or implied conditions in the contract of sale of a business together with the good will thereof to the contrary the vendor is at liberty to set up a similar business in the same locality and carry it on in his own name. Annotations 11 Ann. Cas. 573 et seq; 19 L. R. A., N. S., 762 et seq; 82 A. L. R. 1030 et seq. However, the sale of good will of a business carries with it, even in the absence of a restrictive covenant, the implied obligation that the seller will not solicit his old customers or do any act that would interfere with the vendee's use and enjoyment of that which he had purchased.

Upon the advent of prohibition in Washington petitioner built a brewery in California and thereafter manufactured beer in that state. Having resumed the sale of beer in the State of Washington after the repeal of prohibition in 1933, it had undoubtedly built up an advertising and sales organization for that state. When the contract of April 23, 1935, was entered into it owned the old brewery property at Seattle, which it used for offices and as a cold storage plant and warehouse. But under the contract the old brewery property was sold to Century and petitioner discontinued its beer business in the State of Washington. This situation continued during the five-year period from 1935 to 1940, during which time its transactions with Century were on a royalty basis, so that in 1940, when petitioner sold the exclusive and perpetual right to use its trade names and brands in connection with the manufacture and sale of alcoholic malt beverages, it was not engaged in any business of selling alcoholic malt beverages in the State of Washington. During this five-year period, from 1935 to 1940, Century had built up its sales of "Rainier" beer through advertising and its own sales organization from 60,000 barrels sold in 1936 to 131,000 barrels sold in 1940, so that the agreement by petitioner not to compete had little, if any, value in 1940. In the opinion of the Board of Tax Appeals in *Christensen Machine Co.*, *supra*, it was said, in discussing an agreement not to compete for a period of five years:

* * * It [the purchaser] thus obtained the right to conduct its business free from Christensen's competition during a period when it was not in a strong position. This was a valuable asset in the hands of the petitioner, the benefits of

which would continue over a period which would not necessarily be coextensive with the five-year period provided in the agreement. To illustrate, the petitioner in two years' time might have so strengthened its position that Christensen's competition could not affect it, or in the five years it might have so strengthened its position that as a consequence for one or more years thereafter Christensen's competition would be less severe than it otherwise would have been. *The fact remains, however, that as each year passed, the time was that much nearer when the benefits derived from the contract would be completely exhausted.* [Italics supplied.]

It must be borne in mind that the sale here in question was made in 1940 and not in 1935. In our judgment, considering all of the facts and the legal restrictions under which petitioner would have had to compete had it chosen to do so, we are of the opinion that any value which the agreement not to compete had in 1935 had been exhausted when, in 1940, Century elected to exercise the option and purchase the exclusive and perpetual right to use the trade names in its business.

We hold, therefore, that no part of the $1,000,000 received by petitioner for the exclusive and perpetual right to use its trade names in the State of Washington and the Territory of Alaska was received in payment for its agreement not to compete with the purchaser in that territory.

*Decision will be entered under Rule 50.*