Estate of John C. Burns, Deceased, Maud Burns and H. J. Burns, Administrators v. Commissioner.
Estate of Burns v. Comm'r
Docket No. 8188.
United States Tax Court
1947 Tax Ct. Memo LEXIS 104; 6 T.C.M. (CCH) 973; T.C.M. (RIA) 47242; August 25, 1947
*104 Harris Burns, Esq., for the petitioners. S. Earl Heilman, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The petitioners are the administrators of the estate of John C. Burns, deceased. Respondent has determined a deficiency of $9,967 in the income tax liability of the Burns Transportation Co., J. C. Burns, Individual Owner, deceased, for the calendar year 1941. The sole issue here involved is what part of the gain realized by the decedent in 1941 upon the sale of his transportation business is attributable to the sale of the good will of the business rather than to the transfer of certain municipal bus franchises. The facts were presented by stipulation, oral testimony and documentary evidence. The facts stipulated are found to be as stipulated. Findings of Fact On December 1, 1941, John *105 C. Burns was the owner of the Burns Transportation Co. which furnished bus transportation to the public within the contiguous cities of Florence, Sheffield, Tuscumbia and Muscle Shoals, Alabama, and which also operated a taxicab business in Sheffield, Ala. On that date, Burns sold his business to Shoals Transit, a corporation, for a price of $100,000, $34,000 of which was paid in cash and the remainder thereof by the execution of 11 promissory notes of $6,000 each. Burns went into the taxicab business in Sheffield in 1914. On February 3, 1933, he also began operating busses in the abovenamed cities. He conducted the taxicab and bus business under the name of Burns Transportation Co. He began operation of the busses at the request of the local power company and the municipal governments of each of the four cities immediately after the Alabama Power Co. ceased operating street cars in these towns. The Burns Transportation Co. furnished local bus service to the inhabitants of these municipalities, the busses operating along specified routes, having designated stops and established rates of fare. At some unknown date prior to February 3, 1933, Burns had operated charter busses and had *106 also had a bus company running between Florence, Sheffield, Tuscumbia and Decatur, Ala.
Burns began his operations on February 3, 1933, on a small scale and obtained a letter from the Alabama Public Service Commission permitting him to operate. It was not until some time in 1936 that it was determined by the Alabama Supreme Court that the Burns Transportation Co. did not come under the jurisdiction of the Alabama Public Service Commission because its busses operated within the city limits of four contiguous cities. In 1933 two other individuals applied to the Alabama Public Service Commission for authority to operate a bus line paralleling in part the area serviced by the Burns Co. This competing line operated for about three months and then went out of business. In 1936, after the decision of the Alabama Supreme Court, Burns secured for himself, his heirs and assigns, franchises from each of the 4 cities, Tuscumbia, Sheffield, Florence and Muscle Shoals, authorizing for a period of 30 years the operation of his busses on regular schedule over specified routes in and adjacent to each of the respective cities. The franchises, granted by city ordinances, were secured at a cost *107 of $1,358.77 and were carried on the books of the company as a fixed asset in that amount. The record does not reveal the nature of the expenditures totalling $1,358.77 made in connection with obtaining the franchises. The franchises obtained from the cities were not exclusive, and could be declared to be forfeited by the appropriate officials of each municipality upon abandonment of the service by the company. The ordinances granting the franchises did not contain any prohibitions against Burns' abandoning the service, but each stipulated that the franchise could be assigned only with the express consent of the municipality granting the franchise. It was necessary for an operator of a bus line in these four cities to have permission, oral or written, from either the State Public Service Commission or from the municipalities over whose streets the busses were operated. On December 1, 1941, no competitors operated busses over lines paralleling those served by the Burns Transportation Co. On that date Burns operated the sole taxicab business in Sheffield, in which city taxicabs were not permitted to cruise. In the other cities served by the Burns busses, taxicabs could and did *108 cruise and pick up passengers along the bus routes. The net profit of the Burns Transportation Co. for both the bus and taxicab business was $16,932.59 in 1940 and about $25,000 for the first 11 months of 1941. About one-fifth or one-sixth of the 1941 net profits was attributable to the operation of the taxicab business and the remainder to the operation of the bus business. Burns and his wife executed a deed on December 1, 1941, conveying the assets of the Burns Transportation Co. to Shoals Transit. The deed of conveyance included as part of the property transferred "the good will of the business heretofore operated by * * * John C. Burns, doing business as Burns Transportation Company" and contained a covenant that the transferors would not engage in the operation of similar or competitive business in the counties in which the four cities were located. The four franchises granted by Tuscumbia, Sheffield, Florence and Muscle Shoals were also transferred to Shoals Transit, the appropriate governing body of each municipality having agreed to the assignment. Decedent had a heart attack on January 1, 1941, and was unable to work. His son, John Harris Burns, one of the petitioners *109 here, managed the business from that time until it was sold. After the new owners took over the property, this son continued to manage the business for them and did so for about 10 months until he entered the armed services. The records of the Burns Transportation Co. were stored in a small office and most of them were destroyed or disappeared while the son was in the service. A. A. Crow was one of the small group of individuals who organized Shoals Transit for the purpose of acquiring the business owned by the decedent. Crow invested about $10,000 in the stock of Shoals Transit and died about six months after the purchase. His stock was sold by his estate for $20,000 one year after his death. There were no changes in the franchises held by Shoals Transit between the time it acquired them and Crow's stock was sold. The sale by Burns to Shoals Transit resulted in a gain of $37,322.09 to the decedent. Of this amount, $1,106.93 is the recognized gain on the sale of land, of which 50% or $533.47, is to be taken into account as a long-term capital gain. Respondent has determined that the recognized gain on the sale of good will was $3,364.92, of which 50% or $1,682.46 was taken into *110 account in the deficiency notice as a long-term capital gain. The recognized gain on depreciable assets other than franchises amounts to $13,215.16, all of which is to be taken into account as an ordinary gain. The respondent has determined that the remainder of the gain resulting from the sale, $19,635.08, was attributable to franchises. The assets transferred by the decedent to Shoals Transit had been held by him for more than 24 months. Opinion KERN, Judge: We are here called upon to determine what part of the gain realized by decedent upon sale of his transportation business in 1941 was attributable to the sale of the good will of the business and what part of the gain was attributable to the sale of his municipal bus franchises. Respondent has determined and now contends that $3,364.92 of decedent's gain was attributable to the sale of good will and that $19,635.08 of the gain was attributable to the sale and assignment of franchises. Petitioners contend that the gain of $19,635.08 was also attributable to good will. Under Section 117 of the Internal Revenue Code only 50 per centum of the gain recognized upon the sale or exchange of a capital asset *111 by a taxpayer other than a corporation is taken into account in computing net income where the capital asset has been held for more than 24 months. The intangible assets here under consideration were held for more than that period. Under the same section, property, used in trade or business, of a character which is subject to the allowance for depreciation provided in Section 23 (1) of the Code is not considered as being a "capital asset". Inasmuch as the franchises here in question are depreciable assets, the parties being in agreement on this point, any gain attributable to the sale of the franchises is not subject to the 50 per centum capital gain limitation. See section 117, infra, and section 19.23 (1)-3 of Regulations 103. On the other hand, since good will is not a depreciable asset, and since the term "capital assets" as defined in section 117 includes all classes of property not specifically excluded by section 117 (a)(1), it follows that good will is a capital asset within the meaning of that section and only 50 per centum of any gain recognized upon the sale of that item is to be taken into account in computing the decedent's 1941 net income. See X-Pando Corporation, 7 T.C. 48, *112 Rainier Brewing Co., 7 T.C. 162, and sections 19.23 (1)-3 and 19,117-1 of Regulations 103. The provisions of the Internal Revenue Code and Regulations 103 which are applicable here and which have been cited above, are set forth in the margin. [1]
*113 The respondent's determination is presumed to be correct and the burden is on the petitioners to prove that it is wrong. Welch v. Helvering, 290 U.S. 111; Estate of Harold W. Grant, 1 T.C. 731, 734. The method whereby respondent allocated to good will $3,364.92 of the gain on the sale of intangibles and $19,635.08 to the franchises has not been shown. However, we are unable to conclude from the unsatisfactory record before us that the petitioners have overcome the presumption of correctness which adheres to the respondent's determination. We are aware of the fact that decedent's company did not have exclusive franchises and that the value of its franchises might have been diluted by the granting of similar franchises to others by the municipalities concerned. We are also aware of the possibility that the franchises, held by decedent, were revocable. The fact that decedent obtained the franchises at far less cost than the value which respondent places upon them has also been noted. On the other hand, the decedent started furnishing bus service to the residents of the four municipalities in 1933 at the request of the local power company and the municipal *114 officials of the cities which granted the franchises here involved, which indicates that the local public authorities had special confidence in decedent's ability to furnish good service. The decedent did, in effect, enjoy for years a local monopoly in the bus field and it is improbable that the local officials would have been inclined to grant permission to other interests to operate bus service in competition with the Burns Transportation Co. While it is possible that the gain attributable to good will was actually in excess of $3,364.92, and the gain attributable to the franchises was something less than $19,635.08, nevertheless from the evidence submitted in this case, we do not find it possible to determine with any assurance that respondent erred in so determining. Petitioners have sought to establish the amount of gain attributable to good will through the testimony of two witnesses. Nothing else of substance was offered on this point, nor have petitioners made any effort to show the value of the franchises. The first of petitioners' witnesses was John Harris Burns, one of the petitioners here and the decedent's son. From the time his father was stricken with his last illness *115 on January 1, 1941, and until the sale of the Burns Transportation Co. on December 1, 1941, this son managed his father's business. After the sale, he continued to manage the business for Shoals Transit for about 10 months. Aside from his knowledge of the operation of the Burns Transportation Co., this witness does not appear to have had any knowledge or experience qualifying him to testify as an expert upon the very elusive problem of the relative values of the franchises and the good will of the transportation company. It was his opinion that the entire amount of $19,635.08 was attributable to good will. His opinion is not persuasive. In addition to the fact that this witness is an interested party in this proceeding and is not an expert in the accepted sense, it is apparent that he gave little or no consideration to the value of the franchises in arriving at his opinion. The franchises obviously had some value for the company carried them on its books as a fixed asset valued at $1,358.77 and the witness admitted that the company required them in order to be able to carry on its bus operations. Furthermore, as we stated in Uncasville Mfg. Co., 19 B.T.A. 920, 927, aff'd *116 on this point in 55 Fed. (2d) 893, cert. den. 296 U.S. 545, "The sworn categorical opinion of the taxpayer corporation's officers is, standing alone, not sufficient to prove that the value and useful life are different from those determined by respondent." The other witness testifying as to the relative values of the franchises and good will of the transportation company was a trust officer of a Montgomery, Alabama, bank. On direct examination it was brought out that this banker had worked on the evaluation of the stock of a bus company for Federal estate tax purposes and that he was then operating a bus line as trustee under a will. It was not established that either the bus company whose stock he evaluated or the company which he was then operating had any similarity in size, nature or operations to the Burns Transportation Co. He was quite frank in stating to the Court that he had not seen any of the operating statements of decedent's business and that he had only heard of this case a few minutes before it was called for hearing. The witness did finally venture an opinion that "probably at least two-thirds" of the $19,635.08 was attributable to good *117 will, but admitted that he "based that figure on just a rough guess". The witness also admitted that he did not know what the physical assets of decedent's company were, although he thought they amounted to about $50,000 or $60,000, most of which consisted of bus equipment. Even assuming that the banker was qualified to testify as an expert witness, it is clear that he did not have any real familiarity with or knowledge of the particular business whose intangibles he was called upon to evaluate, nor was he furnished with such data as an expert as to the values of the good will and of the franchises. All that this witness could do, on the basis of the data furnished him, was to hazard a rough guess. A valuation made in such a haphazard and hasty manner is of little weight, for "valuation is notably a matter of opinion and the force of the opinion is derived from the care and ability used in forming it." Keystone Wood Products Co., 19 B.T.A. 1116, 1121, aff'd 66 Fed. (2d) 258. Even if we give the testimony of petitioners' two witnesses the greatest possible weight, any conclusion which we might arrive at as to the relative value of good will and franchises *118 on the basis of their testimony would be nothing more than a "rough guess" on our part. We might note further, that we do not have before us such financial data or other evidence as to enable us to make our own determination of value of the intangibles here involved. Something more than the proof which we have here is needed to overcome the presumption in the respondent's favor. National Weeklies, Inc. v. Commissioner, 137 Fed. (2d) 39. Decision will be entered for the respondent. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), * * *. (b) Percentage Taken Into Account. - In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income: * * *
50 per centum if the capital asset has been held for more than 24 months. REGULATIONS 103: Sec. 19.23(1)-3 (as amended by T.D. 5196, 1942-2 Cum. Bull. 101): Sec. 19.23(1)-3. Depreciation of intangible property. - Intangibles, the use of which in the trade or business or in the production of income is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. Intangibles, the use of which in the is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business or in the production of income for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior thereto to the satisfaction of the Commissioner. No deduction for depreciation, including obsolescence, is allowable in respect of good will. Sec. 19.117-1. Meaning of terms. - The term "capital assets" includes all classes of property not specifically excluded by section 117(a)(1)↩. * * *