I. J. McCULLOUGH and Virginia S. McCullough, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 18455.

United States Court of Appeals Ninth Circuit.

Jan. 3, 1964.

---

Hanna & Morton, Harold C. Morton and Edward S. Renwick, and Wilson B. Copes, Wellman P. Thayer and James E. Harrington, Los Angeles, Cal., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Arthur E. Strout, and Loring Post, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before MADDEN, Judge of the Court of Claims; BROWNING and DUNIWAY, Circuit Judges.

MADDEN, Judge.

The petitioners, husband and wife, request that we review and reverse the decision of the Tax Court, which is reported in 37 T.C. 1069. The question involved relates to the affairs of the husband, I. J. McCullough, and he will hereinafter be referred to as the taxpayer. The case is properly before us, under the statutes governing procedure. The question involved is whether certain income which the taxpayer received in the years 1951, 1952 and 1953 was taxable as ordinary income, as the Tax Court held it to be, or as capital gain, as the taxpayer contends.

Prior to October 1, 1947, one Sweetman had invented certain methods and apparatus employing explosives for cutting and perforating pipe in place in oil, gas, and water wells. He had filed three applications in the United States Patent Office for patents covering these inventions. He had transferred an interest, apparently a one-half interest, in these applications to his partner, one Robishaw. Sweetman and Robishaw had also granted rights to three other persons, Manning, Dunnam and Gratehouse, to shares in royalties which might be earned by the licensing, by Sweetman and Robishaw, of the use of the inventions by others.

On October 1, 1947, Sweetman and Robishaw, as owners of the patent applications, granted an exclusive license to McCullough Tool Company to use the methods used and described in the patent applications and in any patents which might be awarded pursuant to the applications, for the entire term of the patents. Further details concerning this licensing grant or agreement will appear later herein. The fact that the taxpayer, I. J. McCullough, owned 80% of the stock in the licensee McCullough Tool Company is conceded by the parties to be irrelevant to any issue in this case. The license agreement provided that the licensee Tool Company would pay a royalty of 10% of the moneys derived by the licensee from the sale, lease, rental or use of the devices, or of the methods, covered by the patent applications. The 10% royalty was to be paid ¼ to Sweetman,

¼ to Robishaw, ¼ to Manning, ⅛ to Dunnam and ⅛ to Gratehouse.

Sweetman, at some time after October 1, 1947, and before August 4, 1948, bought the interests of Robishaw, Dunnam and Gratehouse in the patent applications and in the licensing agreement to Tool Company. On August 4, 1948, Sweetman assigned to the taxpayer I. J. McCullough and to his brother, O. J. McCullough, all the interests in the patent applications which he, Sweetman, had acquired from Robishaw, Dunnam and Gratehouse. Thereafter, so far as the royalties from Tool Company were concerned, Sweetman was to receive ¼, Manning ¼ and the taxpayer and his brother each ¼. The taxpayer's brother seems to have later sold a part of his interest to another person, reducing his share to 20%.

The royalties were substantial, and the parties receiving them reported them in their income tax returns as capital gains. They were advised by internal revenue officers that, beginning with the year 1950, the royalty income would be taxed as ordinary income and not as capital gain. Primarily to avoid this heavy taxability, the taxpayer and his brother and Sweetman, on December 28, 1950, entered into separate agreements with Tool Company modifying the existing licensing agreement. The new agreement between the taxpayer and Tool Company, which was typical of all of these 1950 agreements, recited that in 1947 Robishaw and Sweetman had *sold* the inventions and patent applications to Tool Company on a 10% royalty basis; that taxpayer had become the assignee of 25% of the rights of Robishaw and Sweetman in the 1947 agreement, and had become entitled to 25% of the royalty payments which Tool Company was to make thereunder; that taxpayer and Tool Company were desirous of modifying the method of payment provided under the 1947 agreement

"and substituting therefor a fixed, definite total price to be paid by the Corporation to 'I.J.M.' [taxpayer] in consideration of the sale of said inventions and patent applications to the Corporation."

The 1950 agreement then provided that in lieu of the royalty payment provided for in the 1947 agreement, in so far as the taxpayer's 25% interest in it was concerned, Tool Company would pay the taxpayer $717,500, in equal monthly installments of $3500, ending with the payment due on December 28, 1967. The agreement said that the 1947 agreement had been considered by the parties as an absolute assignment or sale of the subject matter thereof and that the 1950 agreement should be similarly construed.

If the 1947 royalty agreement had been left unmodified, as applied to the taxpayer's 25% interest in the royalty, he would have received a great deal more money by way of royalties than he actually did receive under the 1950 modification. Sweetman, who like the taxpayer had a 25% interest in the royalties, and the taxpayer's brother, who in 1950 had only a 20% interest, also entered into modification agreements like that of the taxpayer. The other owners of royalty interests seem not to have done so. Yet during the years 1951 through 1958, Tool Company paid $1,433,947 less for the use of the inventions than it would have paid if the taxpayer, his brother, and Sweetman had not entered into their 1950 modification agreements with Tool Company. Something more than one-third of that saving was at the expense of the taxpayer. The Government says that the 1950 modification was nothing more than "an agreement altering the method of collection." But, to say the least, the agreement greatly altered the amount to be collected.

The taxpayer in 1948 bought from Sweetman a right to one-fourth of the 10% royalty payments which Tool Company would be obliged to pay during the term of its license. The record does not show what the taxpayer paid Sweetman for this interest. In 1948 the extent to which Tool Company could exploit the Sweetman inventions may have been highly uncertain. Suppose the price the taxpayer paid Sweetman in 1948 was

$100,000, and that, by December, 1950, it had become probable that the royalty returns would, though still uncertain, be large. Suppose that, at that time X, not previously concerned with the inventions, offered the taxpayer $500,000 for his interest in the royalties, and the taxpayer accepted the offer. That would seem to be an obvious case of a sale of a capital asset, with the profit from the sale taxable as a capital gain. If the bargain had been that X should pay the $500,000 in monthly installments over a period of years, rather than in cash, that fact would be irrelevant to the question whether the profit should be taxed as capital gain or as ordinary income.

In the instant case the taxpayer, instead of selling his interest in the royalties to X, a stranger, sold his interest to Tool Company, the licensee under the 1947 license agreement, and for $717,500 instead of $500,000. The differences between this actual case and our supposed case would not seem to be substantial. But the Government insists that there is a substantial difference, which, it says, is that the taxpayer did not sell anything to Tool Company, and the reason he did not sell anything is because he had nothing to sell. The Government says that when, in 1947, Sweetman and Robishaw granted to Tool Company an exclusive license to exploit the Sweetman inventions and the patents which might result from the pending applications, that was a sale of all of the right, title and interest of the then owners, Sweetman and Robishaw, in the inventions, applications and patents, which made Tool Company the sole owners of the inventions, applications and patents and made Sweetman and Robishaw strangers to these interests, leaving them owning nothing but a money claim for royalties, if royalties should become due.

It may be that the 1947 licensing agreement contained enough of the elements of a sale so that it would be treated as a sale for the purpose of classifying the royalties which Sweetman and Robishaw would receive from the transaction as installment payments on a sale of a capital asset, and not as ordinary income. That was a mooted question until it was at least partially resolved by the 1954 Act of Congress, 26 U.S.C. (1958 ed.) § 1235. It is not involved in this case. But whether or not an exclusive license is a "sale" for the tax purpose stated above, the 1947 license transaction in the instant case did not make Sweetman and Robishaw strangers to the patents. Tool Company had the right, under the agreement, to cancel it on 60 days' notice. If it had done so, Sweetman and Robishaw, far from being strangers to the patents, would have been the unqualified owners of the patents. Similarly if Tool Company had breached the agreement, its licenses would have been nullified. Sweetman and Robishaw had the right to withhold their approval of any transfer by Tool Company of its license. This right would have extended also to sublicensing by Tool Company. Sweetman and Robishaw could, therefore, have demanded payment for granting their approval, hence this was a right of great potential value. These important rights, and others less important, remained in Sweetman and Robishaw after their 1947 license agreement with Tool Company. And Sweetman, in 1948, after having acquired the interest of Robishaw, Dunnam and Gratehouse in the royalty agreement, assigned to the taxpayer and his brother

"that undivided portion of the entire right, title and interest of any and every character * * * formerly held by said Earl J. Robishaw and heretofore transferred to me * * * in and to the said applications and the applications and the inventions disclosed therein and in and to any letters patent which may be granted therefor: * * * as fully and entirely as the same would have been held by me had this agreement and sale not been made."

This agreement was recorded in the United States Patent Office.

It cannot be said that Sweetman and Robishaw had nothing in the patents after the 1947 license agreement, or that, if they had, Sweetman did not, having

acquired Robishaw's interest, sell it completely and unqualifiedly to the taxpayer. As it turned out, the most valuable things which passed by these assignments were the royalty right of Robishaw, and those of Dunnam and Gratehouse which Sweetman had also acquired. If things had gone differently in the ensuing years, it might have been that the reversionary rights referred to above would have been the most valuable interests passed to the taxpayer by the 1948 assignment from Sweetman.

The Government, at one place in its brief, denominates the interest which the taxpayer had, in addition to his obvious ownership of one-fourth of the royalties, as "a vestigial interest in the patents themselves"; in another place as "those insubstantial rights in the patent"; and in another place it speaks of "The worthlessness of the vestigial rights in the patents." These deprecatory expressions are not properly applicable to a one-fourth interest in substantial reversionary rights in patents which were capable of earning $2,801,947.11 in royalties in eight years.

Cases like Hort v. Commissioner, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168, are not in point. There the taxpayer, owner of property, had rented it out on a long-term lease. The tenant desired to get out of the lease and paid the taxpayer $140,000 to cancel it. The taxpayer argued that the $140,000 was capital gain. But the taxpayer still had the tree, the property which had produced the income. The Supreme Court held that the $140,-000 was taxable as ordinary income. Holt v. Commissioner, 303 F.2d 687 (C.A. 9) is of the same variety. Holt, a producer of motion pictures, had a contract with Paramount Picture Corporation to produce pictures for it, for a specified time. Paramount, desiring to get out of the contract, paid the producer an agreed amount for the cancellation of the contract. This court held that the amount which Holt received was ordinary income and not capital gain. Again, as in the Hort case, the taxpayer had not parted with the tree, which was his skill and earning power as a producer of motion pictures.

The case of Rainier Brewing Co., 7 T. C. 162, affirmed per curiam 165 F.2d 217 (C.A.9) seems to us to be in point, and in accord with our holding in the instant case.

The fact that Tool Company's payments after the modification agreement were to the same person, the taxpayer, to whom its former payments had been made, gives to the instant case a superficial resemblance to the Hort case and the Holt case, cited above. But the resemblance is only superficial. Before the modification, the taxpayer owned a 25% interest in the important reversionary rights and the right to forbid the assignment or subletting of Tool Company's license, or to be paid for consenting thereto, as well as a 25% interest in the royalties. He was a proprietor of the tree, and the amount of his income would rise or fall as the crop of fruit was large or small. After the modification, he was the proprietor of nothing except Tool Company's promise to pay him a fixed sum of money in installments. The cited cases in which the taxpayer commuted his right to gather fruit over a long period by accepting a lump sum immediate payment, but retained proprietorship of the tree, are not in point. The fact that the royalty agreement before its modification was not a perpetual royalty but would expire when the patent expired is no more relevant than would be the fact that a twenty year bond, with fifteen years of coupons still attached, was the subject of a sale at a profit. And it would be immaterial whether the sale was to a stranger or to the obligor on the bond.

The fact that the parties to the various writings, particularly the 1950 modification agreement, used inept language to express what we find to have been their intentions does not, of course, affect our decision.

The decision of the Tax Court is reversed.