## SEATTLE BREWING & MALTING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 2265.   Promulgated April 29, 1946.

*H. B. Jones, Esq.*, and *A. R. Kehoe, Esq.*, for the petitioner.
*B. H. Neblett, Esq.*, and *Clyde R. Maxwell, Esq.*, for the respondent.

858

OPINION.

HARRON, *Judge*: The only remaining issue for decision is whether petitioner is entitled to deduct from its income for the years 1940 and 1941 any portion of the $1,000,000 which it agreed on July 1, 1940, to pay to Rainier upon the exercise of the option of electing to terminate all royalties payable under the contract of April 23, 1935. None of the $1,000,000 was paid by petitioner in 1940. Two hundred thousand $200,000) dollars, with interest, was paid in 1941 and $800,-000, with interest, was paid in 1942.

The petitioner contends that Rainier did not sell to it the right to use its trade names, copyright, labels, etc., but granted the right to use such property on a royalty basis; that its election to terminate all royalties thereafter payable by the execution and delivery to Rainier in 1940 of its promissory notes aggregating $1,000,000 did not convert the existing contract from a royalty basis to a capital transaction, but simply substituted a lump sum payment for payments on a barrelage basis for the use of another's property right; that the transaction was a license, since it did not convey full title to the trade name and the payment was in the nature of rent or royalty and should be considered a prepayment of future operating or production expenses. The petitioner does not contend that the amounts in controversy are deductible as amortization or exhaustion of a capital asset, but recognizes that such an asset is not subject to periodic exhaustion and that if capitalized there would be no recognizable basis for writing it off.

The respondent contends that by exercising the option in 1940 the petitioner converted the existing contract from a royalty basis to a transaction under which it acquired exclusive and perpetual rights of a capital nature to manufacture and sell alcoholic malt beverages under the trade names of "Rainier" and "Tacoma," the cost of which may not be deducted as an expense or otherwise. The respondent further contends, in the alternative, that in the event the Court should determine that the amount of the obligation to Rainier by reason of the exercise of the option by petitioner may be deducted as an expense, the entire $1,000,000 would be deductible in 1940, since petitioner was on the accrual basis.

The question, therefore, turns on whether the sum of $1,000,000 is to be regarded as an expense in the nature of prepaid royalties, or whether it is to be regarded as a capital expenditure. This is not a case of accelerated income taxable as ordinary income.

The contract of April 23, 1935, was divided into three parts, headed "Purchase Agreement," "Licensing Agreement," and "Miscellaneous Provisions." The purchase agreement provided for the purchase of certain real property in or adjacent to the city of Seattle, Washington, including the old brewery then dismantled and used as a cold storage plant and warehouse, together with certain specified personal property, including beer containers, cardboard cases, beer on hand, and office fixtures and equipment. Under the licensing agreement Rainier granted to petitioner, its successors, and permitted assigns "the sole and exclusive perpetual right and license" to market and manufacture alcoholic malt beverages within the State of Washington, and the Territory of Alaska under its trade names and brands "Rainier" and "Tacoma," together with the right to use within the territory any and all copyrights, trade marks, labels, or other advertising media adopted or used by the grantor in connection with its beer, ale, or other alcoholic malt beverages. The consideration for this grant was to be determined at least during the first five years on the barrelage basis, i.e., a specified amount for each barrel of alocholic malt beverage sold or distributed within the territory, payable annually. There was also a provision for a minimum annual royalty of $75,000 and a provision for the reduction of the minimum royalty in the event of local option in a part of the territory covered by the agreement, or governmental action preventing the manufacture and sale of alcoholic malt beverages in the assigned territory. There is a further provision that the real property purchased or, in the event of its sale, $250,000, should stand as security for the performance of petitioner under the contract. It further provided (paragraph thirteenth, which is the important paragraph here) that at any time after the agreement had been in force for five years petitioner "shall have the right and option of electing to terminate all royalties thereafter payable hereunder" by executing and delivering to Rainier its five promissory notes of $200,000 each, aggregating the sum of $1,000,000 and bearing interest at the rate of 5 percent per annum payable, respectively, in 1, 2, 3, 4, and 5 years after the date hereof. The miscellaneous provisions provided:

1. For the purchase by petitioner of malt from Rainier.

2. That petitioner would use its best efforts to increase the sales of "Rainier" and "Tacoma" beer by advertising within the territory assigned to it.

3. That it would sell Rainier at cost malt manufactured under the trade names for distribution outside of the territory assigned.

4. Termination of the contract upon default of petitioner.

5. That no assignment of its contract rights could be made by petitioner without the consent of Rainier.

Petitioner argues that Rainier did not transfer to it the entire title to the trade name, but reserved certain rights, including the right to use the trade name in the manufacture and sale of the nonalcoholic

beverages within the territory and to require petitioner to do certain other things set out above "during the period of time that this agreement remains in force." Petitioner relies on *Clifford H. Goldsmith*, 1 T. C. 711; affd., 143 Fed. (2d) 466; certiorari denied, 323 U. S. 774; *Rafael Sabatini*, 32 B. T. A. 705; affd., 98 Fed. (2d) 753, and related cases. The facts of these cases distinguish them from the case before us and are not controlling here. The *Sabatini* case involved the question of whether the income involved was from sources within or without the United States. The question of whether the transaction granting motion picture rights to copyrighted works was a license or a sale was incidental thereto. The Board of Tax Appeals held that the exclusive world-wide right to motion picture rights for a limited period was a sale, since the contract was made in England. In reversing the Board on this point the Court of Appeals for the Second Circuit said "We cannot agree that what occurred was a sale. It was instead but a granting of a right to produce motion pictures from the works for a limited time." This case did not involve a situation where an exclusive and perpetual right was granted. The *Goldsmith* case, *supra*, involves a formal assignment of exclusive world-wide motion picture rights to a play. The question was whether the money received from the assignment and transfer was from the sale of a capital asset as defined in section 117 of the Revenue Act of 1938. The Commissioner contended that the assignment amounted to a license and, therefore, there was no sale of a capital asset and, in the alternative, that the property involved was property used in petitioner's trade or business of a character subject to an allowance for depreciation, and, therefore, excluded from the term "capital assets" as defined in section 117. In affirming respondent's determination on both grounds, this Court cited *Witmark & Sons* v. *Pastime Amusement Co.*, 298 Fed. 470; affd. *per curiam*, 2 Fed. (2d) 1020, and *Rafael Sabatini, supra*. In the *Witmark* case, as in the *Sabatini* case, the grant was for a limited term and the court held that under such conditions the grantor did not part with all interest in the copyright and could sue for infringement.

The *Goldsmith* case was affirmed. Judge Chase, who wrote the main opinion, held, on the authority of the *Witmark* and *Sabatini* cases, that the assignment was a license and the income was from royalties. In a concurring opinion, in which he was joined by Judge Swan, Judge L. Hand held that Goldsmith was in business as a playwright; that the license granted was "property" within section 117 (a) (1) ; the grant was a "sale"; and the licensee was a customer in the ordinary course of business.

Petitioner's argument that the $1,000,000 which it became bound to pay upon the exercise of the option should be deducted, according

to the best accounting practice, by applying the barrelage rates which had existed theretofore or, in the alternative, over a five-year period at $200,000 per year, in order to properly reflect income, is, we think, unsound. In *Coca-Cola Bottling Co.*, 6 B. T. A. 1333, the grantee had a contract granting it exclusive bottling and selling rights in a certain territory, for which it paid $100,000. The contract had no fixed term, but was subject to termination by either party if the other failed to perform its obligations thereunder, or by the grantor if the grantee failed to properly push the sale of bottled Coca-Cola. The grantee contended that the contract should be treated as a ten-year contract because the amount paid for the right would probably be returned within that time. This contention was denied, because, under the terms of the contract, there was no exhaustion of the capital investment by the lapse of time and the useful life of the contract could not be determined. Cf. *International Textbook Co.* v. *United States*, 44 Fed. (2d) 254; *Jefferson Gas Coal Co.*, 16 B. T. A. 1135; affd., 52 Fed. (2d) 120; *Clark Thread Co.*, 28 B. T. A. 1128; affd., 100 Fed. (2d) 257. In the *Coca-Cola* case the opinion of the Board referred to the expenditure as a capital investment and we think it was, notwithstanding the fact that it might be canceled upon the happening of certain conditions. In our judgment, these conditions were subsequent and did not affect the character of the transfer.

Royalties are often characterized as rents and where, as in the contract here under consideration, they are based on an amount required to be paid each year for the total quantity of goods produced during the year, there is no question but that they are deductible as an expense incident to such product. The mere fact that there was a payment of $1,000,000 in a lump sum is not in itself determinative whether the transaction was a license or a sale. Cf. *Sax Rohmer*, 5 T. C. 183; affd., 153 Fed. (2d) 61; *Sabatini* v. *Commissioner, supra*. We must look to the extent of the rights granted and the finality of the grant. It is the nature of the transaction that is the controlling factor. Cf. *Moore* v. *Marsh*, 7 Wall. 515.

The parties agree that for the contract period prior to the exercise of the option on July 1, 1940, the transactions were tantamount to a license and the payments based on barrelage were deductible as an expense. This may be true, and in fact it makes no difference whether we designate it as a license or as tantamount to a perpetual assignment of a right of use with a condition subsequent which might defeat it upon the happening of the event specified. In any event, there was a definite term measured from year to year when the expenditure applicable to income for the period could be definitely determined and exhausted. Cf. *Philip W. McAbee*, 5 T. C. 1130.

On July 1, 1940, the petitioner had the option of continuing to operate under the contract on a barrelage or royalty basis, or to end payments based upon the quantity of beer produced and to acquire the right to operate indefinitely upon the payment of a fixed sum of $1,000,000, regardless of the amount of beer produced thereafter. The payment of the fixed sum had no relation to production or sales or to the quantum of use of the trade name. Since petitioner's production had increased to the point that it was apparent that payment on a barrelage basis would soon approach $200,000 a year, which it would be required to pay under the option agreement, and since petitioner did not want to pay royalties indefinitely, it was considered good business to exercise the option. This the petitioner did on July 1, 1940. After the payment of $1,000,000 the rights of the parties were very different, as were also their obligations. Rainier no longer had the right to call the contract breached and take over the trade name for failure to pay the price. By the same token, there was no longer any object in having petitioner hold the real property purchased from Rainier, or its equivalent in value, as security for the performance of its contract. Prior to the exercise of the option petitioner's right, although designated perpetual in the contract, was not in fact perpetual. It was perpetuated so long as the petitioner continued to pay royalties and was subject to being forfeited by a breach as provided in the contract. After the exercise of the option the right became perpetual in a real sense. Thereafter there was no further payment to be made and the forfeiture clause became inoperative. The exclusive right to use the trade name in the designated territory became perpetual and the liability of having it revoked by the happening of a subsequent condition no longer existed in a real sense. Provisions such as the maintenance of quality, advertising, and the purchase of malt were for the mutual benefit of both parties, and the agreement to protect the licensee against infringement was no different than one to protect title. The most important provision in the contract was the payment of the price, and, when payment had been made in full, provisions for the mutual benefit of the parties became of relative minor importance.

The right to use a trade name is a monopoly, as is a copyright or a patent. It carries with it the right to control its use in connection with a manufactured article and to prevent any competition that might destroy its value. It is a property right and the trade name is property, no less so because it is intangible. The right of alienation is one of the essential incidents of a right of property. Whatever right the owner may have to protect the control over the trade name beyond his own sales must depend upon agreement. He can not divide his property in the name, but he may assign or transfer a property

right thereto by grant in a limited territory. If such grant is exclusive and perpetual, its characteristics more resemble a sale than a license, and this is particularly true where all the consideration has been paid. In *Goldsmith* v. *Commissioner*, supra, Judge L. Hand said "It does not unduly strain the meaning of a sale to make it include an exclusive license." But see *Rohmer* v. *Commissioner*, supra, where the court thought the fact that the time was unlimited was immaterial, due to the very limited scope of the grant.

It is true under this agreement that petitioner could not assign the rights granted to it without the consent of Rainier, but we do not regard this provision as controlling here. Neither could Rainier assign the right to another or use it itself. The exclusive grant to petitioner resulted in the retention by Rainier of the naked legal title in the interest granted for the benefit of the grantee. Moreover, by the grant of an exclusive right and the agreement not to compete, Rainier transferred to petitioner its business in alcoholic malt beverages sold under the trade name in the limited territory.

In *Parke, Davis & Co.*, 31 B. T. A. 427, the contract recited that in consideration of certain payments to be made the licensor sells and grants unto the licensee the exclusive right, license, and privilege to manufacture and have manufactured for its exclusive use and to use, but not to sell, the invention covered by the patents subject to certain conditions. The question before the Board was whether the transaction was a license or a sale. The respondent's contention that the transaction was only a license was based on the fact that the petitioner did not part with all of its rights and that the licensee did not receive, among other things, the right to sell or the right to improvements, or the right to grant license to others without the consent of the licensor. The question was entirely different from that presented in *Waterman* v. *Mackenzie*, 138 U. S. 252, and similar cases where the right to sue was in question and was denied because the right to sell or license the use had been retained by the assignor. In its opinion the Board said:

> * * * *Here we have a question of income tax liability where legal title is of little consequence and the inquiry is as to the ownership of the beneficial interest.* We are not to determine whether petitioner or Eli Lilly & Co. could maintain a suit for infringement in its own name, but merely whether petitioner, under its contract with Eli Lilly & Co., divested itself irrevocably of certain capital investments in consideration of the payment made to it by the latter company. If this is the fact, then the transaction for income tax purposes is no more than a conversion of capital.
>
> * * * Legal title alone, without beneficial ownership, and held for the interest of another, is without value. [Italics supplied.]

The fact that in the contract the parties were termed licensor and licensee was of no consequence, *A. B. Watson*, 24 B. T. A. 466; affd.,

62 Fed. (2d) 35. It was held that the rights granted or surrendered determine the character of the instrument to have been an absolute conveyance of a one-half beneficial interest in the patents involved.

In *Commissioner* v. *Celanese Corporation*, 140 Fed. (2d) 339, the question was whether certain payments under a contract were royalties or income subject to the withholding clause, or whether the parties had effected a purchase and sale and not a royalty contract. The Commissioner's case was based on the theory that there were in the contract restrictions and limitations which indicated that it was no more than a licensing agreement, since, as a result of these provisions, the user might lose the patents and the vendor might recover them. In regard to this the court said:

* * * We find no merit in the claim. Most of the language * * * embraces precautionary provisions in the protection of the rights of the parties, respectively, under the contract. None of it affects the intent and purpose of the contract to vest immediately in the Purchaser absolute title to the patents.

The court held that the transaction was a sale.

In *Jefferson Gas Coal Co.*, *supra*, a so-called lease was held to be a sale of coal in place rather than a lease, the intent of the parties as disclosed in the instrument being a purchase and sale. The sum and substance of the agreement was that the grantor sold all the coal in place for a consideration on a deferred payment basis. If the petitioner had not mined or moved any coal by the end of the term it would have paid the entire stipulated price in annual installments, irrespective of the total quantity of coal recovered. The Board held that such provisions are foreign to an actual lease and disclosed the true nature of the agreement to be a sale rather than a lease.

In the case before us the $1,000,000 was paid, irrespective of the total quantity of beer manufactured. Thereafter it was of no consequence whether the petitioner manufactured a quantity of beer which at the royalty rate produced a lesser or a greater sum over any given period. It, therefore, makes no difference what terminology is applied to the payment. Regardless of the language used, it was the intention of the parties that upon the payment of $1,000,000 the petitioner should have the exclusive and perpetual use of the trade name "Rainier," regardless of the quantity of beer manufactured and for all future time. These provisions, we think, are inconsistent with the theory of a lease or license and are more consistent with the idea of a sale. Other provisions in the contract giving Rainier the right to require petitioner to do certain things, such as keeping the quality of the malt and beer manufactured equal to Rainier quality, were but conditions subsequent, primarily applicable to the period during which payment was made annually on a barrelage basis, and were for the benefit of both parties, both before and after the exercise of the

option. Whether or not Rainier could have enforced these provisions after the exercise of the option is immaterial, our question being the character of the transaction incident to the option under which the petitioner paid $1,000,000 in consideration for the exclusive and unlimited right to manufacture and sell alcoholic malt beverages within a designated territory for an indefinite future time. Since the right was exclusive and unlimited as to time within the assigned territory, we think it very doubtful after the payment of $1,000,000 that Rainier could have interfered with petitioner in the exercise of that right. It is significant that immediately after giving the notes Rainier was willing to cancel the security which it held under the contract and the requirement that petitioner purchase malt from it. The real consideration throughout was the payment of the price, and once that was paid in full Rainier had no ground upon which to base a cancellation of the contract under which it might have received liquidated damages, and petitioner lost its right to have the payments reduced in the event of a decrease in sales through local option or national prohibition. Nor can it be said that, Rainier having assigned an exclusive right, it was thereafter interested more than petitioner in the quality of the alcoholic malt beverages manufactured and sold by petitioner under the trade name "Rainier" in the exclusive territory designated. All of these facts are consistent with the idea of a sale, but not consistent with the idea of a license. We see no inhibition, where a corporation owns a trade name, to its assigning a right to use that name in a designated territory for a price, and if the right to use is perpetual and exclusive it is more consistent with the idea of a sale than a lease, particularly where it is not dissociated from the business or mer chandise with which it has been used. Cf. *Green* v. *LeClair*, 24 Fed. (2d) 74. In *Waterman* v. *Mackenzie, supra*, it is said:

> Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions.

In *Boesch* v. *Graff*, 133 U. S. 697, there was a provision in the contract of assignment that under certain circumstances the title to the patent should revert to the assignor. The Supreme Court held that the title had already vested, but was liable to be defeated in the future on the failure of the conditions subsequent. In *Rude* v. *Westcott*, 130 U. S. 152, there was an assignment with a provision that the net profits arising from sales, royalties, settlements, or other source were to be divided between the parties to the assignment so as to give the patentees one-fourth thereof. The Court held that this did not limit or modify the absolute transfer of title. Where such a provision reserves to the grantor no control over the patents or other use or disposal, or any power to interfere with the management of the business growing out

of their ownership, it is not material. In *Littlefield* v. *Perry*, 88 U. S. 205, there was an assignment of the patentee's interest in the patent and a provision voiding the assignment upon the failure of the assignee to do certain things. The Court held that neither the agreement to account and pay royalties nor the clause of forfeiture for nonperformance reduced the transferees to the position of licensees.

In the appeal of *Dwight & Lloyd Sintering Co.*, 1 B. T. A. 179, the license agreements to make and use certain patented machines for refining ores acquired by a corporation for stock was intangible property for invested capital purposes.

In *LaBelle Iron Works* v. *United States*, 256 U. S. 377, the laying out of money by a concern in acquiring something of permanent use in the business is defined as a capital transaction.

In *Coca-Cola Bottling Co.* v. *Coca-Cola Co.*, 269 Fed. 796, it was held that the right to a trade-mark is a property right which may be sold in connection with the good will of the business, since it is a symbol of part or all of the good will; but it can not be sold wholly dissociated from the business or merchandise with which it has been used. In this case there was a contract whereby the manufacturer of a syrup for soda fountain drinks granted the exclusive right to bottle and sell beverages under its trade-mark within a specified territory to a corporation which agreed to establish a bottling plant sufficient to meet demand for the product in the territory and to purchase syrup for such drinks from the manufacturer. It was held that the contract was a perpetual contract and not a contract at will, and that it granted and conveyed property rights in and to a business which the manufacturer had never developed, and that all the provisions of the contract were adapted to carry out that intention.

In *Griggs, Cooper & Co.* v. *Erie Preserving Co.*, 131 Fed. 359, the instrument recited that F grants, licenses, assigns, and sets over to G and its successors in business the absolute and exclusive use of certain trade-mark in and to certain states, such absolute and exclusive use to be held and enjoyed by G for its own use, but during such time only as it and its successors shall continue in business; provided, however, that G shall not use any label which shall imitate or conflict in color or design with the label used by F; and provided that the agreement shall not prevent F or its successors from using such trade-marks in said states, provided it shall not adopt any new label which shall imitate or conflict in color or design with the label of G. On these facts the court held that the contract did not give G a mere license, but assigned the exclusive ownership and good will in the trade-marks within the specified states, merely reserving to F certain permissive rights of personal use.

In *Andrew Jergens Co.* v. *Woodbury, Inc.*, 273 Fed. 952; affd. *per curiam*, 279 Fed. 1016; certiorari denied, 260 U. S. 728, it was held that

where the owner of a trade-mark gave an exclusive license with certain exceptions and the transaction disclosed a purpose to transfer the rights therein, it was not a mere license, but in legal contemplation constituted an assignment, notwithstanding the use of the word "license."

As we interpret the contract here in question, it was obviously the intention of the parties that Rainier grant to petitioner all of the right which it had to use the trade names "Rainier" and "Tacoma" in the manufacture and sale of alcoholic malt beverages in the State of Washington and the Territory of Alaska. It was also the intention of the parties that this grant was to be exclusive not only as to third parties, but as to Rainier itself. We know of no reason why one who is the owner of the right to use a trade name may not grant to another its exclusive use in a limited territory for all future time upon the payment of a price. Cf. *Coca-Cola Bottling Co. v. Coca-Cola Co., supra.* Such a grant, while not disposing of the entire property in the grantor, is the equivalent of such disposition within the limited territory granted. Clearly such a grant would be a capital transaction and the amount paid by the grantee could not be exhausted because it was perpetual. Cf. *Coca-Cola Bottling Co., supra; International Textbook Co. v. United States, supra; Charles P. Limbert Co.,* 9 B. T. A. 1390; *Andrew Jergens Co., supra.* The fact that the amount paid by the grantee was an expenditure incident to production does not change the situation.

Finally the petitioner argues that it was not the intention of the parties to change the agreement from a royalty basis to a capital transaction by the exercise of the option, and that paragraph thirteenth should not be so construed. We find no ambiguity in the contract and the language in paragraph thirteenth is clear. It provided that at any time after five years petitioner "shall have the right and option of electing to terminate all royalties thereafter payable hereunder" by executing and delivering to Rainier its promissory notes in the principal sum of $1,000,000. Obviously, it was intended that after the execution of the notes all royalty payments as such should cease. The agreement admits of no other construction. Thereafter Rainier must look for payment to the promissory notes and not to the contract. The execution and delivery of the notes put an end to the payment of royalties on a barrelage basis and was the consideration for the exclusive and perpetual use of such rights thereafter. It is our opinion that upon the exercise of the option petitioner acquired a capital asset for which it paid $1,000,000. This was a capital transaction and the amounts payable thereunder are not deductible from income. The action of the respondent is sustained.

*Decision will be entered under Rule 50.*