**HERWIG et al. v. UNITED STATES.**
No. 49561.

United States Court of Claims.
June 3, 1952.

· John P. Allison, New York City, for the plaintiff. Silverson & Allison, New York City, were on the briefs.

J. H. Sheppard, Washington, D. C., with whom was Acting Asst. Atty. Gen. Ellis N. Slack, for the defendant. Andrew D. Sharpe, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

Plaintiffs seek to recover a portion of federal income taxes paid by them in the year 1945 on the proceeds received by plaintiff Krakower from the Twentieth Century-Fox Film Corporation for the sale of the exclusive motion picture rights to her book "Forever Amber." As residents of California, plaintiffs each reported one-half of the amount received as income under the community property laws of that State.

The maiden name of plaintiff, Kathleen Winsor Krakower, was Kathleen Winsor. During the period herein involved she was the wife of Robert J. Herwig whom she married in 1936 while both were students at the University of California. Through-

out the calendar year of 1945 both plaintiffs were citizens of the United States and residents of California, though plaintiff Herwig was then serving overseas in the Marine Corps. Subsequent to the filing of the petition in this cause, Kathleen Winsor Herwig married Arnold Krakower, prior to which time she had separated from plaintiff Herwig, and an appropriate motion was filed showing the change of name. Throughout the proceedings before the commissioner of this court plaintiff Krakower designated herself by her maiden name Kathleen Winsor and hereinafter she will be referred to by said maiden name of Winsor or as plaintiff.

In 1943 Kathleen Winsor completed the novel originally entitled "Wings of the Morning" which was later changed to "Forever Amber." On March 2, 1944, Miss Winsor entered into a contract with The Macmillan Company for the publication of her book. The terms of that contract reserved to her the motion picture and certain other specified rights to the literary work.

On January 8, 1945, Miss Winsor entered into a contract with Twentieth Century-Fox Film Corporation, designated as "Purchaser" under the contract, in which she as owner did "grant, convey and assign" the exclusive motion picture rights in and to her literary property for $125,-000 in cash plus additional payments not to exceed $75,000. After the deduction of certain commissions she received the net amount of $165,000 for these rights.

The principal issue before us is whether her profit from this transaction was taxable as long-term capital gain. That in turn depends upon whether the transaction constituted a sale of capital assets held for over six months.

From the chronology of dates above set forth, it is obvious that the motion picture rights, having been reserved under the publishing contract entered into March 1944, had been held considerably in excess of six months at the time of their disposition in January 1945.

However, in order to ascertain whether the movie rights were a capital asset we must first determine whether the transaction between Miss Winsor and the Twentieth Century-Fox Film Corporation, disposing of her motion picture rights in "Forever Amber" constituted a "license" or a "sale." In the event the transaction be regarded as a sale, then we must decide whether the property transferred was held primarily by Miss Winsor for sale to customers in the ordinary course of her trade or business. Section 117 (a)(1) of the Internal Revenue Code; 26 U.S.C. § 117 (a)(1) (1946 Edition), provides in part as follows:

"(1) *Capital assets.* The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *."

The contract with Twentieth Century-Fox Film Corporation provided in part:

"First: The owner does hereby grant, convey and assign unto the Purchaser, its successors and assigns forever:

"(a) The sole and exclusive motion picture rights and motion picture copyright throughout the world in and to said literary property.

"(b) The sole and exclusive right, throughout the world, to mechanically produce, reproduce and license the reproduction of * * * all or a part of the theme, text and/or dialogue contained in said literary property.

"(c) The sole and exclusive right to make, produce, adapt, sell, lease, rent, exhibit, perform and generally deal in and with and copyright motion picture versions of said literary property, * * * to add to and subtract from the literary property, * * * and to register and obtain copyright therein, throughout the world * *."

A separate assignment simultaneously executed also contained these provisions.

The contention of the plaintiff that the above language clearly expresses an intent to sell the motion picture rights is met by the defendant's contention based upon the indivisibility of a copyright as an individual thing which cannot be split up and partially assigned either as to time, place, or particular rights or privileges, in less than the sum of all the rights comprehended in the copyright; and that while exclusive rights may, however, be granted, limited as to time, place, or extent of privileges which the grantee may enjoy, such limited rights operate merely as licenses.

This concept of the indivisibility of a copyright has been embodied in a ruling of the Commissioner of Internal Revenue in I. T. 2735, XII-2 Cum.Bull. 131 (1933) in which he ruled in substance that a copyright constituted a single unit of property and that any rights granted thereunder by the author were merely licenses and that amounts paid for the rights granted constituted royalties which were taxable as ordinary income.

The copyright act provides that a person entitled to a copyright by complying with the provisions for registration, including the deposit of copies, 17 U.S.C. §§ 5, 10, 11, 12, shall have several "exclusive rights" which are specifically enumerated in the five subsections of Section 1 of the statute, 17 U.S.C. § 1. They include the right to print, publish, and sell copies (subsection (a)), the right to translate, dramatize, convert into a novel (subsection (b)), to perform publicly (subsection (c)), to make transcriptions or records, to exhibit (subsection (d)), and to reproduce mechanically (subsection (e)). The "one package rule" of the tax law is said to have been used to rationalize the conviction that a transfer of less than all the rights conferred under Section 1 of the copyright act makes the transferee "a mere licensee" entitled to less judicial aid than an "assignee"—proprietor. Amdur, Copyright Law and Practice 788–803, 913–924 (1936); 13 C.J. 1094–1096; 18 C.J.S.,

Copyright and Literary Property, § 82 et seq., p. 205, et seq.

While this court has not been called upon to pass upon this question of the indivisibility of copyrights, other courts have had occasion to squarely consider the matter. In Goldsmith v. Commissioner of Internal Revenue, 143 F.2d 466, 467, the Second Circuit Court of Appeals unanimously held in result but not in theory that an author's assignment of motion picture rights constituted a sale, and in a second concurring opinion, concurred in by Judge Swan, Judge Learned Hand rejected the "one package rule" or theory of indivisibility and stated:

"Copyright and literary property are monopolies; they entitle the owner to prohibit various kinds of reproduction, and to relieve individuals of these prohibitions by licenses. The licenses may do no more than excuse what would otherwise be infringements; or they may be exclusive, as in the case at bar. An exclusive license requires the author to protect the licensee against other infringement, and is for most purposes treated as 'property'. I think that it is 'property' within § 117 (a)(1); that its grant is a 'sale'; * * *."

In Wodehouse v. Commissioner of Internal Revenue, 4 Cir., 166 F.2d 986, the taxpayer was a nonresident alien author who had transferred to the Curtis Publishing Company his American, Canadian, and South American serial rights in three stories and to the Hearst's International Cosmopolitan Magazine his American and Canadian serial rights in a fourth story for a lump-sum consideration in each case. The Commissioner of Internal Revenue contended that the proceeds of these transactions were taxable as "fixed or determinable annual or periodical gains, profits, and income * * *" from United States sources under Section 211 (a) of the Internal Revenue Code (1939), 26 U.S.C. § 211 (a). The taxpayer argued that the amounts received were the proceeds of sales and hence not within Section 211 (a).

In writing for a majority of the courts, Judge Soper rejected the theory that a copyright or literary property is an indivisible unit so that any attempt to split it up results merely in grants of licenses. At pages 989 and 990 of 166 F.2d he said:

"The language of some of the decisions gives seeming support to this idea, but when the exact point in controversy in these cases is ascertained, it will be seen that the courts were concerned with procedural matters and did not undertake to controvert the undeniable fact that serial rights, book rights, dramatic production rights and motion picture rights of a literary production are property rights which may be and are separately and effectively bought and sold in the literary market. * * *

"The authorities cited in Rohmer v. Commissioner [2 Cir., 153 F.2d 61], supra, on the indivisibility of the copyright do not show that there is anything inherent in the nature of a copyright which renders impossible the separate sales of the several parts which comprise the whole. * * *

"The courts have been repeatedly admonished that in matters of taxation they should be governed by the substance rather than the form of a transaction and should not be diverted from the realities by undue consideration of the technical refinements of title to property."

This decision was later reversed by the Supreme Court in Commissioner v. Wodehouse, 337 U.S. 369, 69 S.Ct. 1120, 93 L.Ed. 1419, wherein a majority regarded the question presented as being merely the proper interpretation of Section 211 (a) of the Revenue Act of 1938, 52 Stat. 527, 26 U.S.C. § 211 (a), rather than the divisibility of an author's rights.

While the Commissioner of Internal Revenue did not contend that the divisibility of the copyright was involved, ibid., 337 U.S. at page 376, 69 S.Ct. at page 1123, Justice Frankfurter pointed out in his dissenting opinion that unless there is something inherent in the copyright law to prevent a lump-sum payment for an exclusive property right transferred and transferable to the taxpayer, such a transaction is a familiar "sale of personal property" and that "surely it is a sale of a capital asset." Ibid., 337 U.S. at page 410, 69 S.Ct. at page 1140.

In Joseph A. Fields, 14 T.C. 1202, the Tax Court dealt with the question arising under Section 117 (j) of the Internal Revenue Code, 26 U.S.C. § 117 (j). The taxpayer, Fields, assigned the exclusive motion picture rights to two plays. He recognized that he was a professional playwright and consequently did not make the contention herein made by plaintiff that the motion picture rights were capital assets, but he did argue that they represented depreciable property used in his trade or business so that the profits from their sale were entitled to capital gain treatment by virtue of Section 117 (j) of the Internal Revenue Code. The contracts involved, relevant portions of which are reproduced in the opinion at pages 1204–6, are similar to the one at bar. The Tax Court decided that Section 117 (j) was inapplicable and held that the transaction involving the assignment of the exclusive rights to the two plays constituted a sale of such rights.

It is recognized that a series of these cases, which have been dealt with by plaintiff and defendant in their briefs, concern the taxation of nonresident aliens. The Court of Appeals for the Second Circuit has indicated that the question of how nonresident alien authors should be taxed is different from the question of whether a resident author may treat as capital gain the proceeds of sales less than all of his rights to literary property. Thus, in Rohmer v. Commissioner, 2 Cir., 153 F.2d 61, 65, certiorari denied 328 U.S. 862, 66 S.Ct. 1367, 90 L.Ed. 1632, the court upheld the imposition of a tax on a nonresident alien author who had disposed of some of his rights for a lump-sum consideration. When confronted with the earlier decision in Goldsmith v. Commissioner, supra, wherein the majority held that disposition of motion picture rights was a sale, Judge Frank said:

"* * * because of the differing histories and purposes of § 117 and § 211 (a)(1)(A), respectively, we think that the views expressed by the majority in the Goldsmith case have no bearing here. It is well to remember that the concepts employed in construing one section of a statute are not necessarily pertinent when construing another with a distinguishable background."

 Modern business and commercial practices connected with the various rights enumerated in Section 1 of the Copyright Act, 35 Stat. 1075, 1088, 17 U.S.C. § 1, e. g., right to print, dramatize, record, etc., are inherently and essentially different. They can be exercised or purchased by different persons, Ford v. Charles E. Blaney Amusement Co., C.C., 148 F. 642, and include a variety of industries such as the book publishing trade, the newspaper, magazine publishing industry, the legitimate stage, the motion picture industry, and the television industry. It has been pointed out that the value of each one of these rights can be separately computed, Interstate Hotel Company of Nebraska v. Remick Music Corp., 8 Cir., 157 F.2d 744, and the copyright owner can dispose of such portion of his copyright as he desires. Furthermore, many of the separate rights of a copyright owner may be used as the basis for securing new and separate copyrights, e. g., copyright owner of a novel has the right to dramatize it, and he may secure a copyright of the dramatic version. He may also write a motion picture scenario based upon the copyright. Photo Drama Motion Picture Co., Inc., v. Social Uplift Film Corporation, D.C., 213 F. 374, affirmed 2 Cir., 220 F. 448.

Since the basic nature of copyrights, patents and trademarks is the same, i. e., grants of monopolies for a fixed period of time by the Government as a reward for the particular genius of the one receiving the grant, it would seem that the rights granted in connection with any one of them should be treated the same under the law. In Parke, Davis & Co., 31 B.T.A. 427, the Board of Tax Appeals considered the patent cases which had held that a "licensee" who acquired less than all the rights in a patent could not obtain legal title and hence could not sue for infringement. The Board pointed out that a right to maintain a suit at law is controlled by the question of the possession of the "naked, legal title" and deemed that question to be "entirely different" from the tax problem presented, saying that the "legal title" is of little consequence, and the inquiry is as to the ownership of the beneficial interest. The solution was determined solely by the fact that the "licensor" had "divested itself irrevocably of certain capital investments in consideration of the payment made to it."

In the field of trademarks, see Rainier Brewing Co., 7 T.C. 162, affirmed, per curiam, 9 Cir., 165 F.2d 217, and Seattle Brewing & Malting Co., 6 T.C. 856, affirmed per curiam, 9 Cir., 165 F.2d 216, wherein the court cited Judge Hand's opinion in the Goldsmith case, supra, and its own opinion in Parke, Davis & Co., supra, and pointed out that an owner of a trademark or tradename, like the owner of a copyright or patent, has a monopoly which is a property right and which he may assign or transfer even in a limited territory. The court concluded by saying that: "If such grant is exclusive and perpetual, its characteristics more resemble a sale than a license, * * *." Ibid., 6 T.C. 869. The retention of the naked, legal title by the grantor was held to be immaterial.

While it has been suggested that the splitting up of the right on a geographical basis appears less feasible with respect to a copyright than with respect to patents or trademarks, even in the copyright field an agreement of this kind would be possible; e. g., a grant of the rights to dramatize productions limited to certain cities. Fulda, Copyright Assignments and the Capital Gains Tax (1949), 58 Yale L.J. 245, 261. To such a geographical limitation might also be added a language limitation.

Lest there be any concern with a multiplicity of suits which might result from such a split up of the "bundle of rights" in violation of the theory of indivisibility, we observe that the modern rules of civil

practice and procedure [1] and the interest of the parties concerned would undoubtedly insure a final and conclusive judgment in each case involving the "naked, legal title" and the "equitable interests" as they might appear. Furthermore, it is customary to include in the licensing agreement a specific provision regarding the rights of the parties to institute proceedings to enjoin and restrain any infringement of the rights granted. For example, in the agreement between Kathleen Winsor and the Twentieth Century-Fox Film Corporation (Finding 16) there is contained the following paragraph:

"Fourth: The Owner does hereby grant unto the Purchaser the free and unrestricted right, but at the Purchaser's own cost and expense, to institute in the name and on behalf of the Owner any and all suits and proceedings in law or in equity, to enjoin and restrain any infringements of the rights herein granted, and does hereby assign and set over unto the Purchaser any and all cause and causes of action arising or resulting by reason of or based upon such infringement or infringements, and does hereby assign and set over unto the Purchaser any and all recoveries obtained in any such action. The Owner agrees that she will not compromise, settle or in any manner interfere with such litigation, if brought, and the Purchaser does hereby agree to indemnify and save harmless the said Owner from any costs or damages that may arise by reason of any such suits or proceedings."

We believe that it is not only logical but also practical and just to consider the exclusive and perpetual grant of any one of the "bundle of rights" which go to make up a copyright as a "sale" of personal property rather than a mere "license."

We, therefore, hold that the agreement between Kathleen Winsor and the Twentieth Century-Fox Film Corporation constituted a sale of all her motion picture rights in and to "Forever Amber".

We turn now to a consideration of whether or not the property transferred by plaintiff was held primarily for sale to customers in the ordinary course of her trade or business.

The facts, as set forth in our findings, disclose that while Kathleen Winsor had written childhood stories for her own amusement which were later destroyed, and had written several articles on football from a woman's standpoint for a newspaper, the Oakland Tribune, for a nominal fee, her first full-length literary composition was "Forever Amber." This she wrote as a result of her great interest in the English Restoration period of history which her husband was engaged in studying while they were together as students in college. The book was written by plaintiff primarily because she enjoyed the research and writing which went into its composition, and while she hoped that it might be published, the book was not written with that purpose in mind. In the sequence of the events leading up to the actual publication of the book, as well as the eventual sale of the motion picture rights, Miss Winsor sought and received the advice and assistance of persons experienced in the field of literature. Her first inquiry was directed to the literary editor of the San Francisco Chronicle who in turn referred her to The Macmillan Company. On the basis of her letter describing the composition to the general editor of The Macmillan Company in New York City (Finding 5) she was requested to send her composition on for their consideration. After the book had received the consideration of the literary editors of this company, she was offered a contract, the terms of which were described in letter form. While the reservation of motion picture rights was mentioned in the letter, Miss Winsor was most concerned with the suggested delay in the publication of her book because of the wartime shortages of paper and machinery and the suggestion that the editors pro-

---

**1.** See Rule 23, Rules of the U. S. Court of Claims (1951), 28 U.S.C.

posed to cut and edit various passages of the book. After the receipt of The Macmillan Company offer of a contract for the publication of the book she addressed Miss Elizabeth Otis of McIntosh & Otis, Inc., New York City, with a view to employing her as an agent to handle her affairs in connection with the publication of the book. In this letter Miss Winsor reiterated her apprehension over the suggested delay in publication and the proposed cutting and editing of her composition without any apparent concern over the reservation of rights, and asked for the general consideration by the agent of the other propositions set out in the letter of the publishers.

In accordance with the custom of agencies of that character, the final agreement with McIntosh & Otis, Inc., to act as agent, was not reduced to writing, and Miss Winsor apparently did not undertake to give instructions to the agent as to how to proceed on any matters, relying on them to do whatever might be necessary in her behalf.

While the reservation of the movie, radio, and other rights were usual in matters of this kind, they were placed in the contract by McIntosh & Otis in pursuance of their agency's representation, but without any specific direction from Miss Winsor. After the publication of the book "Forever Amber" in October 1944, and at the request of the Macmillan Company, Miss Winsor did speak in various places, had a few interviews on the radio, and autographed books on several occasions. According to the testimony, Miss Winsor was apparently discouraged about the length of time involved in writing historical novels and expressed her mind to anyone who came for an interview to the effect that she did not intend to write any more. However, she did change her mind and in 1946 began writing another book which was published in 1950 entitled "Star Money," and since that latter date Miss Winsor has done no further writing.

The disposition of the motion picture rights was handled by Miss Annie Laurie Williams, a specialist in the disposition of literary properties to the motion picture industry, who had a working agreement with McIntosh & Otis, Inc. Miss Winsor was unfamiliar with the manner in which literary properties were acquired by the motion picture industry and testified that she was only interested in securing the highest possible return for her story. Consequently she left the matter of arranging for the disposition of such rights almost entirely in the hands of her agent, Miss Williams. In accordance with the usual practice, Miss Williams' name was written into the contract with the film companies as the agent of Miss Winsor, and after the execution of the agreement and the assignment with Twentieth Century-Fox Film Corporation, covering the motion picture rights to the book "Forever Amber", the motion picture company forwarded the amount agreed upon for the rights to Miss Williams, as agent, who, after deducting her commission of ten percent, sent her check for the balance to Miss Winsor.

The testimony also reveals that in 1945, at the time the motion picture contract was entered into, it was not uncommon for motion picture companies to lease motion picture rights and further that Miss Winsor apparently was as agreeable to a lease as she was to the sale, in view of the fact that her main interest was only in securing the highest possible return for her story.

From a consideration of these facts we do not believe that it can be justly said that Miss Winsor held her motion picture rights "primarily for sale to customers in the ordinary course of business." Since the word "primarily" appears in the statute, it must be accorded its proper meaning. United States v. Bennett, 5 Cir., 186 F.2d 407.

It must be borne in mind that we have before us in this proceeding only the transaction involving the sale of motion picture rights to the book "Forever Amber." From the record it appears that this is the only such transaction to which Miss Winsor has ever been a party. It is true that after expressing herself to the effect that she would never again write a his-

torical novel because of the work and length of time involved, she did write a second book entitled "Star Money," but plaintiff contends that her activity in the field of literary composition and the incident sale of one of her novels were not sufficient to constitute the "business" of writing and selling motion picture rights. In Fahs v. Crawford, 5 Cir., 161 F.2d 315, 317 it was said:

> "Of course, a person may be engaged in more than one business * * *. Carrying on a business, however, implies an occupational undertaking to which one habitually devotes time, attention, or effort with substantial regularity."

In Commissioner v. Boeing, 106 F.2d 305, 309, certiorari denied, 308 U.S. 619, 60 S.Ct. 295, 84 L.Ed. 517, the court said: "* * * the facts necessary to create the status of one engaged in a 'trade or business' revolve largely around the frequency or continuity of the transactions claimed to result in a 'business' status." Recently this court had occasion to consider this question in Boeing v. United States, 121 Ct.Cl. 9, 98 F.Supp. 581, wherein we considered whether amounts received by owners of timberlands under two contracts giving others the right to cut and remove timber, remitting a portion of the gross proceeds to the owners, constituted capital gain under Section 117 (k)(2) of the Internal Revenue Code, 26 U.S.C. § 117 (k)(2). Writing for the majority of the court, Chief Judge Jones said:

> "These, then, are capital gains unless perhaps it can be said that plaintiff was in the trade or business of selling timber to logging companies. Two contracts, one in 1922 and one in 1928, did not have that effect. Nor could the logging companies' sales to their customers have had that effect on plaintiff. See Peebles v. Commissioner of Internal Revenue, 5 T.C. 14. We have found that plaintiff entered into these contracts for the purpose of liquidating his investments in timber. He entered into only two transactions. These gains were capital

gains to him." 98 F.Supp. at pages 584, 585.

See also Harriss v. Commissioner, 2 Cir., 143 F.2d 279, wherein a taxpayer who purchased 21 properties and made 13 sales over a period of 27 years was held not to be holding his property primarily for sale to customers in the ordinary course of business. Phipps v. Commissioner, 2 Cir., 54 F.2d 469; Samuel E. Diescher, 36 B.T.A. 732; affirmed 3 Cir., 110 F.2d 90, certiorari denied, 310 U.S. 650, 60 S.Ct. 1099, 84 L.Ed. 1415; Edward C. Myers, 6 T.C. 258. The same test of volume and continuity of transactions has been applied in cases involving the sale of tangible personal property. Reynolds v. Commissioner, 1 Cir., 155 F.2d 620.

Plaintiff's retention of motion picture rights at the time she entered into the publishing contract with The Macmillan Company cannot be construed as the acquisition of an asset for resale in the ordinary course of business. In Goldsmith v. Commissioner, supra, a playright who had written only one play used it as a basis for radio scripts while he continued his writing from which he derived his entire livelihood. It was there held that the taxpayer's trade or business was that of author and playwright and the copyright in question was used in his trade or business during both taxable years. The facts in this record indicate that Kathleen Winsor did not continue the exploitation of her book after she disposed of the motion picture rights. Defendant points to the fact that plaintiff made several personal appearances, autographed books, etc., in connection with the exploitation of the sale of "Forever Amber" at the time of its first publication. Again it must be remembered that we have before us only the transaction involving the sale of the motion picture rights which was the only transaction of such a nature in which Miss Winsor engaged. Furthermore, the fact that plaintiff's agent, Annie Laurie Williams, was engaged in the business of disposing of motion picture rights did not affect Miss Winsor's status. Boeing v. United States, supra; Reynolds v. Commissioner, supra.

From a consideration of the record before us and in the light of the authorities we conclude that at the time of the transaction with the Twentieth Century-Fox Film Corporation on January 8, 1945 Miss Winsor did not hold the motion picture rights to her book for sale in the ordinary course of business within the meaning of Section 117 (a)(1)(A) of the Internal Revenue Code, 26 U.S.C. § 117 (a) (1) (A).[2] These rights were capital assets and the proceeds from their sale represented capital gains.

Judgment will be entered in favor of each plaintiff in the sum of $26,358.72, with interest as provided by law.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.

2. Section 210(a) of the Revenue Act of 1950, 64 Stat. 906, 26 U.S.C. § 117(a) (1) (C), added to the exception from the definition of "capital assets": "a copyright; a literary, musical, or artistic composition; or similar property; held by—(i) a taxpayer whose personal efforts created such property, * * *."